The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez! Oyez! Oyez! All persons having any matter or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit, are punished to draw an eye and give their attention where the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We'll begin our argument in our first case, Cantley v. West Virginia Regional Jail. Mr. Keach, be pleased to hear from you, sir. Thank you, Your Honor. Good morning. May it please the Court. My name is Elmer Robert Keach III. It is my privilege today to appear on behalf of the appellants, Michael Cantley and Floyd Teeter. The central question that I believe this Court has to decide today in considering the procedures of the West Virginia Regional Jail Authority is balancing the concept of human dignity, which this Court has spoken about in the Amici v. West decision and has been spoken about elsewhere, against the needs of correctional facilities and the policies and procedures that they put in place. Obviously, the Florence case is the central precedent that the Court will consider as part of deciding the claims made by the plaintiffs and the appellants in this case. And the Florence case discussed in the concurrence of Justice Alito how the searches at question in this case are deeply offensive and humiliating. Justice Alito further made clear as part of his discussion that many... Go ahead, sir. Justice Alito did join the majority opinion. He did join the majority opinion, and I believe that the caveat of that majority opinion addresses the factual nuances that are present in this case but were not present in the Florence decision. The Florence decision addressed people who were committed to a local correctional facility by a judge after they were arraigned, after they had an opportunity to contest their detention, and after they had an opportunity to post bail. That may be truer insofar as Mr. Teeter, but not Cantley. You would agree? I do not agree, Your Honor, although I will concede that the complaint in this case primarily addresses one instance where Mr. Cantley was taken into custody where he was, in fact, arraigned and put into the Western Regional Jail. There are other occasions that were put in the papers before the District Court where Mr. Cantley detailed that he was in there on prior occasions during the class period. We provided booking records to that effect in the Court. Is it clearly the case that there was an instance alluded to that he was there on a pre-arrangement type situation where he may have been stripped? Is that really established here? I thought the one insofar as Mr. Cantley concerned the instances in which he actually did go into the general population, he did face the arraignment. The instance that's referred to in the plaintiff's third amended complaint references that instance that Your Honor is talking about where Mr. Cantley was arraigned and put into custody after he had seen a judge. We did provide the Court with booking records and Mr. Cantley's testimony that on prior occasions he had also been put in after he was arraigned, or excuse me, after he was arrested, but not yet arraigned, and he was then arraigned on video, similar to Mr. Teeter. But you're acting as though Florence was some kind of big victory for you, but they didn't reach this other question that you're talking about in the Alito concurrence. If you read the Florence opinion, line after line after line, it talks about the discretion accorded, correctional offices, the difficulty of trying to classify people right at the outset, talking about the dangers of weapons and the dangers of contraband. I mean, if you look at the weight of the opinion taken as a whole, realize you can try to pluck something from the concurrences and everything, but the weight of the opinion as a whole is hardly an unqualified victory for your point of view. Your Honor, I don't believe that I've characterized the Florence decision as a victory from my point of view. I believe my briefing... What is your point of view? My point of view is this. The Florence decision took a set of facts that we don't have here. People that you know are going into custody, people that you know are going to stay there, and using the balancing test in Bell and the factors in Turner and balancing the rights... You know, but we're not... I mean, we're not just balancing off of a blank slate. The question is, first of all, it seems to me, could these correctional offices... Where do you fare notice about what standards go in their conduct? And certain things may be clearer post-Florence than they were pre-Florence. And is it really fair to expect these correctional offices to sort of dope out exactly how Florence was going to come out and to be clairvoyant? Because the cases prior to Florence were, frankly, all over the lot. And that's why the Supreme Court took Florence to resolve all of these uncertain matters. And even then, the Supreme Court split 5-4 on the question. And how prior to Florence are these people supposed to figure everything out? When you impose damages on someone, you should do it because they violated clearly established standards. Well, this case is... I'm sorry, sir. I mean, all I'm saying is that just because these are officers of the state or just because they wear a uniform or just because they're correctional officers, you know, they're entitled to notice of what the standards for their conduct are, just as all the rest of us are. And that's a problem because certain things seem to me to be prohibited after Florence. But that's a different question for me as to whether these individuals could be clairvoyant. Your Honor, there's two components to this case in the district court. And the primary component of it is the effort to seek prospective injunctive relief about these practices and a determination as to whether or not they're constitutional. So that's the primary focus of this litigation is seeking injunctive relief, not seeking monetary damages. Certainly, that's pled in the class action complaint. And there's a separate... It was a prayer for monetary damages. Yes, sir, there was. And there's certainly a question of qualified immunity as it relates to the individual policymakers in question in this case, the three individuals who headed the West Virginia Regional Jail Authority. The judge didn't reach that, he said, though, did he? He did not. The judge below did not. It's a constitutional issue here. The judge only reached the constitutional issue and determined that there was none. And in the briefing I put before the court, I asked that... Everyone can affirm on an alternate ground. Absolutely, Your Honor. I don't agree that that should be the case because I think, or excuse me, I would suggest to the court that the Logan v. Scheele decision is not expressly overruled in the Florence case. Let me ask you about your argument. I want to ask exactly what you meant when we talked about Cantlie and the facts of Cantlie. And you said there were other papers submitted. Did you mean you argued other situations in which Mr. Cantlie had been treated in this way when he wasn't put, arraigned and put in a general population? Is that what you meant by that? Yes, sir. And that was argued in front of the district court. And you argued that to the district court? It was argued in the papers and it was argued at oral arguments. I don't understand what you said, papers. My apologies. No, no. Now, let me ask you this. Do you think the facts, forget the timing for a second, the facts as they play out in Cantlie here, do you think that's controlled by Florence? Not the timing, but just the facts. I'm going to get to you on the timing, that he was arraigned and eventually put in a general population. Do you think Florence would allow that? Yes. Okay. The instance where Mr. Cantlie was arraigned, he saw a judicial officer, had an opportunity to contest his detention, and then was ordered into custody. So then why don't you lose on facts here in Cantlie? I lose on the facts relative to that particular search, yes. Okay. That search is covered under the Florence decision. I want to get back to something Judge Wilkinson said before about the— Let me ask you one other— I'm sorry, sir. Let me just ask one other question. My apologies, Your Honor. No, no, no. What if, in fact, an officer at the time he searched didn't know if somebody was going to go into general population? Your view is that would—but the person did go into general population. You think that officer would be protected or not? The testimony— I'm just asking you—this is kind of a hypothetical. I'm asking you that under your theory. If an officer performed the search before the officer knew as a certainty the defendant was going to go into general population, but the defendant, in fact, under my fact scenario, did go into general population, is that a protected search? Generally, officers know how people— I didn't ask you that. I asked you—I said if he didn't. I would certainly think in that instance if an officer was not aware of the person's detention status for reasons that are not applicable, that are not in this case, he would be—I would think that would be protected by qualified immunity, that instance, yes. That's not the case here, though. Speak to the constitutional question. That's the issue before us here. Yes. The trial judge didn't rule on that, except we can look at an alternative, as Judge Wilkinson said. But I thought your argument was to the constitutional question. In addressing what Judge Wilkinson said before or questioned me about before, deference to correctional authority is not abdication. The bell-balancing test— That's arguing at a very general level, though. In the case of Mr. Teeter, it seems to me it's sort of on the line because it gets a bit to what Judge Shedd was asking you about, which was that Teeter was in a holding cell where it could have been expected that a van of inmates— it held up to 15 people, and he was moved eventually because a van of inmates was coming in. And so he wasn't held in an individual cell or anything. He was held in a cell with 15 inmates or what have you, or it could have been 15 inmates. It was constructed to hold that many. And that seems to me kind of on the line, but isn't that the very type of sort of in-between or gray area or foggy area in which qualified immunity would attach? In response to what Judge Shedd asked me, in this case, they know who's going to go to— What you're pointing toward is it's not always possible to tell right at the outset who is going to be put in a general population and who is not. Now, there's some instances you would be able to. In this instance, that is established. Mr. Mincer admitted that at oral argument in front of Judge Chambers. People that come in that are court-ordered commits, they immediately go to the general population. People that come in that are temporary commits are held in the booking area separate from the general population until they are arraigned and a determination is made of their detention. So we're not suing individual corrections officers here. So there's not an issue of— This is all pre-Florence. That's not—well, yes, that procedure is allegedly pre-Florence. We're not sure that's the case, but we didn't have a chance to really explore it. And there was at least the possibility that given that the cell was constructed for 15 inmates that a larger number of inmates would arrive. What I'm saying is you may be right going forward, and that's certainly a fair point. The question is, and what I think is an uncertain area, prior to the Florence decision, whether we can expect a correctional officer to figure out exactly what the law is in this area for this type of situation. I mean, I can't do it. I couldn't do it. I tried to look over the different decisions prior to Florence and the different fact situations. Logan and Amici applied to very different fact situations. And I'm not sure I could figure out exactly what was permissible and what was not. And I just ask you, due process is a standard that embodies notions of fairness. And the question whether you can fairly punish someone without clear notification of what conduct is prescribed, that's what troubles me. I would agree with Your Honor that, and I believe my colleague Mr. Litt in the follow-on case will discuss this at greater length, but qualified immunity certainly is a difficult issue that the court has to deal with here and one that is certainly uncertain. Let me take you back to my question. You answered my question with, yes, it's covered by qualified immunity. If you can remember my hypothesis. I remember. Yes, sir. I'm asking you, post-Florence, do you think that is a constitutional violation, not qualified immunity, so that the person, let's just say the procedure being used is a procedure that searches before the jail or the officers know for sure that defendant is going to go to general population, but in fact, in the facts of the case, the defendant does go to general population. Do you think that's not qualified immunity? I'm asking, is that a constitutional violation in your view? May I have the privilege of proceeding past my allocated time? Sure. Thank you. Not too long, but I'll let you answer it. I do want to answer your question, Your Honor. I want you to. Yes, I do believe it is a constitutional violation because a corrections officer can easily find out and in fact will always know. No, I don't want to go to that point. The point is you think if he does it or she does it before they know, you think that's a violation? Yes, if they do it before they're arraigned, I believe that's a violation. If it's done after arraignment and they go into general population, then no, it is not a violation. But the procedure in this case. Thank you. Yes, sir. Thank you, Your Honor. May it please the Court, Your Honors. I have the privilege, obviously, of representing the state of West Virginia, our regional jail authority, and three executive directors who have ran that authority for the last 15 years. As Judge Wilkinson just pointed out, if we can't figure out a group of reasoned heads able to look at and discern the law, whether this was okay or not pre-arraignment. That goes to the qualified immunity question. Agreed entirely. The Court didn't even rule on that. This is a constitutional issue here. I mean, we may want to reach over and touch it and we'll get into the next case, but this is a constitutional question. I'm with you entirely. How in the world do you get around Florence insofar as Teeter? I don't know about Cantley. I'm having some problem of seeing how he fits in. But when you look at the Florence decision, a 5-4 decision, Chief Justice Roberts and Justice Alito wrote very limiting concurrences. My math tells me you subtract those two from the five, you're going to have three left in the majority. And they explicitly said, and particularly Chief Justice Roberts said it right from the beginning. By the way, excuse me for interrupting, but there's nothing wrong with three judges. Thank you, Your Honor. I must agree. Sometimes even two can be good, too. Chief Justice Roberts, in his concurrent opinion, he said words to the fact that we must not embarrass the future, which is interesting. They recognize that, well, you've got an instance here of an individual who's out snow-plying his yard. He pushes snow out into the road. Officer comes along and says, you're obstructing things. They get into a thing. He gets arrested. Goes in and strip searches him. While he's going through the strip search, one of the officers says, well, you know what? Officers here are doing the same thing. We could arrest them for that, too. Well, he strip searches. His genitals are checked out. He's open. He has to bend over and expose himself all out in the public. You know, that could be Grandma, who was out there shoveling snow in the yard, too. And that same thing could happen. And I think Chief Justice Roberts and Alito recognize that, that there's a limit to this. On the one hand, we're concerned about contraband, but for every citizen to be subject to a potential strip search just on a balancing, when there's no consideration of that, Titor is very limited in this instance. And that's why I point to his case in particular on the constitutional question. I'm not there on the it may well need to be remanded on immunity or we might be able to get to it. I don't know. But the constitutional question is difficult on Titor. The constitutional question is the one I'm interested in, Judge, because the qualified immunity issue is already settled. That's easy for all of us. The issue of moving forward, what happens on this claim for injunctive relief? Well, the claim for qualified immunity is settled. It's settled while we're here. It's settled because I'm here on a constitutional issue. The qualified immunity issue, again, if the three of us, if the three of you or all of us in this room can't figure out. You're right. Didn't reach in this case. So that's why I say I don't know about the settled aspect of it, but it didn't reach it in this case. When I say settled, I say settled because Judge Wilkinson pointed out that we can't determine pre-Florence whether it was okay or not. It's just your argument. If we were to get the qualified immunity, it's easy. That's what you're saying. That's easy. But it also seems to me it's an interesting thing because it seems to me Judge Winn's making some good points about going forward. There are limits, and if someone's not going to be in the general population, I agree with my colleague's review of the concurring opinions. A blanket strip search policy prior to arraignment for somebody who's not going into the population, that's bad. And that does seem to me to be the constitutional rule going forward. The problem is you've got a case with Teeter who's kind of on the line here. You've got circuit decisions, district court decisions all over the lot. You've got someone who's not in a single holding cell but somebody who could be joined by a much larger number of people. It's murky in terms of imposing damages on somebody. And the other thing is these strip searches, there's no question that they are offensive to human dignity, but there's also, and Florence's opinion points this out time and time again, both pat-down and strip searches are conducted where they need to be to protect the safety of inmates because the jail environment is something where the strong prey on the weak, and you don't want the weak to be even more vulnerable than they already are. Your Honor, to address the point of pre-arraignment strip searches, the strong, as you've described them, that get inside start out in those communal holding cells, the strong that prey on the weak. And every rationale for strip searching once somebody gets in or is going to general population applies when they're in that 15-person communal holding cell just as equally. So the issue is, and the court determined, you talk about the grandmother that might be out and gets brought in on a misdemeanor charge, or Mr. Teeter in this case. The problem is that the Supreme Court recognized there are all sorts of circumstances where someone gets brought in on what would otherwise be thought of as a minor non-dangerous charge that ends up with contraband. Well, but it's even more serious because the record in both of these cases indicate that there is a real possibility not only of contraband and cell phones and the like, but we're talking about razors and knives. And under Whitley v. Albers, let's suppose that something happens which we all wish not to happen, and that is somebody gets badly hurt. Somebody gets slashed up or whatever, and that's because the knife wasn't found or the razor blade wasn't found. And then you're going to be in court. You're right. We get sued and you didn't even look for it. You're going to be in court on a failure to protect claim. You're right. Because you did not do enough to protect the safety of that inmate who was taken advantage of by people who were either bigger or better armed than he or she was. So it comes down to a balance. The Supreme Court struck a nice balance, I think, going forward, but that doesn't mean we should clobber you with damages for failure to figure out what, frankly, I could not. And understand, the Supreme Court didn't say pre-arraignment, it's not okay to do. Everybody is coming with this sort of argument. I want you to keep in mind that even when you look at Justice Alito's concurrence and Chief Justice Roberts' concurrence, even in those instances you can do a strip if you have suspicion. You can. That's all it is, a suspicion. Not probable cause. It's not all this extra stuff. It's a suspicion. It tells you an ordinary citizen come in and you've got someone pushing snow out on the road and there's no history of anything there. You just can't, and you're not going to put them in the general population. You've got them over in an attention sale and you've got them, and by the way he's being escorted when he's in that area with the 15 or so the whole time he's there, that you just don't strip ordinary citizens under there unless you have a suspicion. So all of these horrors, parade of horrors that can happen, you just need a suspicion. I know the Supreme Court used the Timothy McVeigh example, but you could pick any example on extreme that will be an exception to any rule you make. And use that as a basis to go on the other way with it. Well, if we negate. Here's the problem I'm having, though, at least in where we're going. If we're talking constitutional analysis, that's one thing. If we're talking qualified immunity, it's another thing on this. And if we're going qualified immunity on it and we're talking about the law, I'm not sure the law was all over the place in the Fourth Circuit. The Logan case was the law here. And so that's the law you have to deal with when you're dealing particularly with Tita at this time. It is a Logan case, not the law all over the place in other places. It's the Logan cases. You're right, Judge, and we all understand from looking at Logan v. Shealy that it doesn't say pre-arraignment strip searches are unconstitutional. We know that because she wasn't pre-arraignment. She was post-arraignment when she got searched. It's not a slam dunk is what I'm saying. It's almost like you need for the qualified immunity if you're going to go there, some trial court or somebody needs to go back and look at Logan and come up and make some determination based on the facts. Does it fit within Fourth Circuit precedent? Logan made two really important points that I agree with entirely and that make perfect sense to me. The first is where is the search done, and is it done in private? In our case, our regional jails do more private searches than what Florence was subjected to because Florence had five other detainees in with them when he was strip searched one of his two times. In our jails, every detainee is searched by himself and one correctional officer of the same sex always, no exceptions. And so we're more private. That's a really important consideration. The second is, is it done pursuant to a reasonable effort to reach your penological goal, right? And in Logan v. Scheele, it clearly was not because she was released within minutes of the strip search. All of the facts that lead up for determination of whether that happened or not were facts the trial judge never got to because it never made that determination. I mean, all of that may well be true. That's the way it happens here. But it didn't analyze it from a qualified immunity perspective. It did it from the constitutional side. That's right. Logan v. Scheele actually went up on directed verdict. But your point is that the facts of Logan are dramatically different from what we have here because the detainee was being held without being exposed to any other detainees. They hadn't even tried a pat-down search. The search was done where other people could see her naked body. I mean, the search was outrageous. It's patently offensive. It's patently offensive. But that's a far cry from what happened here, which was a search by an officer of the same sex. There were two pat-downs. It was conducted in private. In other words, you said, hey, they made one mistake after another, and you conducted this in a totally different way, in a totally different fashion. And when we're talking about the balance between security and privacy, which is what we're talking about, the facts and the manner in which a search is conducted make a big difference. They matter. Because the dignity interests are implicated in the manner in which it's conducted. The big issue of Logan v. Scheele was. We understand it. Qualified immunity versus constitutional. If you're talking constitutional law on this and you're looking at those concurrent opinions, even a scenario, just as Wilkerson puts forth, that is privacy, same officer in the cell, will not fit if that person's not going into the general population and if that offense is relatively minor. It doesn't matter if you can take them in a little room with the same sex by themselves and search them. You still can't do that to an ordinary citizen if you're not putting them into the general population or there's no danger of them being in exchange. Under those two concurrent opinions, and as I indicated, the sitting opinions, which were four of them, said the same thing along with those two. So that's unconstitutional, too, in that arena. For 40 years, the U.S. Supreme Court has recognized that there is a loss of privacy and a loss of freedom of choice as an incident of detention. The question is, does this search serve a legitimate penological interest? In Logan v. Scheele, it did not because there was no safety interest. Let me ask you this on the facts as they pertain to Teeter. In this case, I'm not talking about qualified immunity. I'm talking about the constitutional violation. I want you to make your argument to me or to us on what is the most important fact as to Teeter that means there is no constitutional violation, and if it's different, what is the minimal fact, the minimal and minimum fact that makes that argument? The largest, most significant factor is this. He's put in a communal holding cell. How many people? With one other person specifically to him. However, at the time he gets put in there, it's absolutely not predictable as to whether it's going to be one or going to be 15. And if you're going to put him in with 15 other people, you're not going to protect his safety by strip searching each of those people. Let me see if I understand. Then is your argument that if you're going to be put in anything other than a solitary cell, it's constitutionally justified? If you're in a solitary cell, there's no reason to do a strip search. Would that be yes or no? That's a yes because even under Logan v. Sheely, if you're by yourself, there's no reason. There's no safety reason. Wait one second. You just told me 15 people, and I said, was he in with 15? And you said no, but at the time you did not know. Well, under the solitary cells, how would you know at that time that maybe you just didn't get doubled up and you had to put two people in a cell? I took as a definition solitary was going to be one person. If he's by himself and in a cell where he's only going to be by himself, there's no reason. I said solitary cell. I didn't say by himself. But is your argument if there's any chance at all that he'll be placed with somebody else in detention, constitutionally it's justified? Well, he's going to be put in one. No, no. I asked you if that's your argument, that it's constitutionally justified. That is argument because you've got to save him from others. And the only time a strip search, a body cavity search is not justified is if the officer knows beyond any doubt that at the moment he wants to do the search, the person cannot possibly end up with another inmate. Is that your argument? If he can't end up with another inmate, there's no safety reason, thus no legitimate penological purpose served by doing that strip search. So that means that basically everybody can be strip searched, body cavity searched for anything, anytime. If you're jealous set up so that you keep everybody in individual cells by themselves, there's no reason to do a strip search before they get arraigned. It's not that limited. And if you look at Chief Justice Roberts' concurrence, he doesn't say, you know, you actually put him in with the general public. He says there's no alternative available to not put him there. And then Alito follows up and uses the word could. He could be put somewhere other than general population. It doesn't give officers a carte blanche opportunity then to say, well, we've read Florence, so from now on we'll just put everybody in the general population. That doesn't work. If there's an opportunity, you've got someone come in, snow plow, and I keep using that because that's the example, put on the road, ordinary citizen, and you've got a little spot you can just hold them here for this very minor offense. He says, no, I'm going to put them in the general population. Therefore, I can strip search them. You can't do that. At least under Chief Justice Roberts, he's very strong on that point. That's why he used that language, not to embarrass the future. He knows what this means. You're right. The exact language used is, do you have facilities available to house him singularly? We do not. He doesn't say singularly. From the general population. The fact that you bring another detainee and sort of stick him in with it doesn't necessarily make that general population. We've got two issues with that, not just one. One is he's put in with one, but unpredictably may be in there with 15 others. But more important than that still is he's taken into the core of our facility to go to video arraignment, meaning he's walking past detainees who are in general population. He's escorted. You're right. So what if he's being taken to the core? Well, there are officers in the booking area as well. However, while he's in that communal cell. He's being escorted the whole time he's going through there. That's true. Keep in mind, all of this action is being taken by the officers in terms of where they put him. Their choice is being made here. And the question is, how much do you get to nuance those choices to fit within scenarios that will take you out of constitutional violation? Again, it's a different argument when you're talking Logan and qualified immunity. I think I'm moving in Judge Wilkerson's camp on that. When you get constitutional violation, which is the question we have in this case because the judge didn't get to it, then that's a whole different scenario. There's no question. Nobody's ever said that this even pre-arraignment would be a constitutional violation. Right? Supreme Court in Florence didn't say we've decided you can't do this pre-arraignment. They said that issue's open for another day, which is what we're here about today. Brother, the only point I'm trying to make is a fairly modest one. We've had a lot of fun analyzing Florence, and some good points have been made with respect to the opinion of it. We have the benefit of Florence. They did not. That's why I say that's an easy issue, qualified immunity, and that's not why I'm here. I'm here about is this a constitutional rights violation or not. I clearly don't believe it is, and the reason I don't believe it is is every reason why you would do it when they're going to general population applies equally to once you're going to put them in a communal holding cell. And we don't have an alternative but to put them there. What would you do with the qualified immunity? Would you send it back to the trial judge for determination of whether qualified immunity exists in this case in light of Logan because he didn't make any facts? Or should we just do it ourselves? Well, you all certainly could say, and you're going to have a case right behind me where you're going to have to say whether there's qualified immunity or not. The issue is that preliminary injunction or that injunction claim is going to get sent back if that's what you decide. The point is moot anyway. We don't do pre-arraignment strip searches. Our policy doesn't call for pre-arraignment strip searches. Our training doesn't. Under Pearson v. Callahan, if we resolve qualified immunity the way he wants to resolve it, do we need to get to the question of whether it's a constitutional violation? Absolutely, because there's still an injunctive claim out there that's at stake. And we can decide, okay, from here forward, here's what's going to happen. In qualified immunity, going back, we shouldn't have expected these people, a reasonable person in their situation, to know you could or could not do this. The issue is, is this a constitutional rights violation or not? Is it? Estatete or is it a constitutional rights violation? Absolutely not. Now, let's go back. I just want to be sure I get this straight, really, that I understand your position. You think after Florence, what are the parameters of when there is a constitutional violation under a body cavity search? Well, I would say if you're going to do a physical body cavity search with penetration, certainly that probably would be a constitutional rights violation. However, our situation with no contact. I don't know. You think it would be a violation if they were going in the general population? If you are going to do a penetrative body, intrusive body cavity search by an untrained, medically untrained correctional officer, I would think that there is a serious potential. Stop for a second. What happened in this case with Teeter, the search that Teeter underwent? Are we together on what that is factually? Yes. When would such a search be a constitutional violation after Florence, in your opinion? I don't think it is.  I don't think it is. No. It never is. In our jail system, there is no alternative or potential for a detainee to be isolated by themselves. So you think then, the way you read Florence is, in the real world, you never know for the certainty that is required to forego that search. So therefore, a search is allowed in any circumstance. Yes. We have got all kinds of contraband found. No, I am not asking that. Evidence of that, in this case, justifies that search. Let me ask you one other question. Did the district court make a finding on the no alternative point or whether you would have reason to know that he was going to be in the general population or not? They may have a bearing on the prospective question. I want to know, on those two points, which you made, number one, did you have no alternative to putting him in this larger cell? Number two, were you able to know, at the time you conducted the search, whether he was going to be put in the general population, particularly the alternative point? What alternatives were available? Did the district court make a finding on that? I can tell you, I noticed just now, my time is up, but I would love to answer the question if I can. The district court absolutely said that there are individual cells in that area that are intended for people who are on suicide watch, who are coming off of drugs or alcohol and need to be kept isolated for that reason. This guy was going to a communal holding cell. No question, there was no alternative available. That was a finding made by the district court and a factual truity throughout our entire justice. He was moved when the van of 15 arrived. Into a two-person, two people were put, he and the other guy, into another cell for a period of a little less than an hour. But you're saying he made a specific finding, that there was no alternative, and yet there were individual cells. There are individual cells, again, intended for other purposes and used for other purposes. You say there are individual cells for people coming off of alcohol and drug highs. Wouldn't it have been feasible to put this individual in one of those cells? You may have a circumstance where one of those cells is empty. However, it's not predictably going to occur in perpetuity or in every situation. The intention and the understanding is that these people coming in, new detainees, will go into communal holding cells. I understand your point. What do you think are the limits? Because it's clear that Florence lets you go a long way, but it does have limits. What do you think are the limits, just on your own? Now that you've got that decision, you're going to have a lot to say about how the regional jails go forward. What would be your policy after Florence? What can you represent to court? Because you don't want injunctive relief. What's going to be the puzzle going forward? Do not do intrusive body cavity searches. That's a constitutional rights violation in my mind. At any point, no correctional officer should do that. And we don't do that. Our policy is, if we believe that's necessary, what we'll do is dry cell people and have them sit in there. If they've got to go back to general population... You don't have any blankets. You don't have blanket strip searches, even for people who are going into the general population? Not that it would involve contact or inserting anything into any orifice of the body. We would send them out to a hospital if we deemed that necessary. You're making a distinction about a penetrating body search. That's correct. Much different from visual body cavity inspection. And you think there are no limitations on just the strip search visual inspection? In our circumstance, that's correct, because we don't have an alternative to putting them in communal homes. You don't think that generally? That's why I asked you. Your view of the law after Florence is, unless the officer is absolutely certain, beyond any doubt, there won't be any contact between this defendant and another defendant, that visual strip search is fine. Between detainees. I agree. When we use the word strip search, are we talking about visual searches or are we talking about penetrating searches? We're talking in this case about visual body cavity inspections. And that's what Florence looked at. I understand your view on the penetrating searches, but what is your view on the limits of the visual searches after Florence? What do you mean what a penetrating search is? Anything where you're going to make contact and you're going to go into an orifice of the body. We haven't talked about that here, have we? No, absolutely not. We haven't talked about that in Florence, have we? Absolutely not. You're talking about the visual one that Judge Shedd has talked about. Florence made a major point, though, the fact that there is no contact in its search, which is one of the key components. So anybody coming to your facility now is going to be searched in the manner of Florence now because you have made a decision there's no alternative. That's correct. And you think every citizen that comes in, it doesn't matter, it could be if you bring them in that facility, you're going to strip search them. You're going to do a visual search in the Florence manner because you now have no alternative. Let me make a correction. Let me tell you real quick. We had three jails that were doing pre-arraignment strip searches out of ten against our policy and against our training. However, after it was made clear to them that that was in violation of policy, they stopped doing it. And we had Administrative Sergeant Wayne testify in this case, and it's in the record, that when they were told at Mr. Teeter's jail, Tigert Valley Regional Jail, not to do pre-arraignment strip searches anymore, every officer in there was upset because they believe it compromised the safety of that facility. And, in fact, after they stopped doing those searches, he had two circumstances where, in a communal holding cell, multiple detainees were smoking pot and taking Xanax, and there was a sharing of Xanax by one prisoner that came in. And that is the earmark of what will happen, absent pre-arraignment strip searches, when people are put in those communal cells. That's why we need to do that. It's not just when people are put in communal cells, but when it's possible they'll be put in a cell with at least one other person. They'll be put in a communal cell. The question is whether they end up with other people in with them. You're exactly right. And you can't predict... I see. You say communal cells just because they aren't designed for one person. That's exactly right. And it's the potential for them, for other people to join, not the actual fact, because you just don't know at the time you're going to do the search. I want to be sure I'm straight. I think I am on this. You think when anybody is arrested, they're subject to this... If they're going to be held, they're subject to this search unless it's just a dead sense certainty they can't have any contact with another. Right. If they go to a jail and they're going to have contact with another detainee... So the answer is yes, though. Yes. That's right. They could theoretically be arrested and released without ever going to a jail facility. I'm talking about at the jail. Yeah. So it's always the case that you could potentially house a detainee with somebody else, isn't it? That's always the case now. It wasn't the case in Logan v. Shealy. They knew she wasn't going to be housed with somebody else. She was released within 15 minutes. Now, under your scenario, is always a possibility that a person being arrested can be housed with someone else? In West Virginia Regional Jails, yes. And so following... So Logan, the concurrences mean nothing. There's no possibility of exception, even if... Because what you created now is always a possibility. And if you follow that, then it doesn't mean anything. Every one of those reasons to do it once somebody goes to general population applies equally to when they're going to get put in a communal holding cell. I don't think that's the end of this issue, but we'll see. Is that true that there's... Even for someone just to take your ordinary drunk, whom you say goes in a solitary cell, with respect to that person, for example, is there a reason to believe that they might be part of the general population? Yes, because once you are done sobering up, you could be held in a West Virginia jail for up to 12 hours before your arraignment, in which case you're going to be put in that communal holding cell because you're going to need that individual cell. If you're going to be held at a jail for any amount of time, visual search is constitutional. That's correct. So Florence, you just made it blanket. Has no exception, no possibility of exception now to that. Body cavity searches that are invasive. What in the world was Chief Justice Robertson and Alito talking about? That there's not a possibility of exception to this thing. I don't get it. I don't know what they were talking about. I don't know what he's talking about when he says not to embarrass the future. Chief Justice said that. What in the world could he have been talking about? Because everybody's going to be searching in West Virginia. I understand you're talking about two judges. There's a lot more than that up there. Yeah, there are four dissenting judges that agreed with him. Well, we've got to go by the majority opinion. I mean, that's all we have. And I can get in trouble adding and subtracting. Just try to go with the majority, what the majority says. That's right. Anyway, thank you very much, sir, and we will hear from you in rebuttal. Thank you. Thank you, Your Honor. I'd like to raise one issue that has not been the subject of this argument thus far but is an important component of the appellant's arguments in this case, and that is the concept of the delousing. And I'd like to point to the hypothetical posed by Judge Wynn when he talked about Grandma coming into the West Virginia Regional Jail Authority. She will get stripped. She will get searched. She will get strip-searched. Grandma and anybody else, the Pope can come in there. If you get arrested, he is going to get strip-searched. Yes, sir. And not only is he going to get strip-searched. Don't break the law in West Virginia. He will get strip-searched. That's exactly what I heard. Well, certainly this case has caused me to have caution about sending my children to college in West Virginia. That's for sure. It's a funny thing because it's not a funny thing, but it's a troubling thing because when you have a blanket policy, it's always said to be too broad. And then when you have a selective policy, the accusation is that you're profiling or singling out members of certain ethnic groups or people in certain demographic profiles. So I'm not sure. I mean the blanket policy is sweeping, but the selective policy is profiling. And so you get, you know, they're whipsawed. I mean you're catching them going and you're trying to catch them going and coming. Your Honor, I think that dichotomy is measured by the Florence decision about people who end up going into custody and that being appropriate for everybody. But, you know, I do keep coming back to the fact that the majority opinion, line after line after line, talks about the very real danger of introducing these contraband and things and cell phones because cell phones are prohibited, I think, under federal policy in the Bureau of Prisons. And, you know, we say, well, we're balancing the needs of prisons against the needs, against the dignity of the individual. But there's a dignity of the individual point on the other side, too, and that is that people do not want to get slashed with razor blades and with knives. And, you know, that's a part of, that would be a part of my human dignity, and especially if I couldn't defend myself because I was a little bit older or a little bit younger or didn't, less able to engage in a fight or whatever. And, you know, I worry if we go too far in your direction that we're just leaving these people vulnerable and exposed. And that, you know, that really troubles me because I don't want on my conscience that somebody's been slashed and beaten because we're not letting you say, oh, well, you can do reasonable suspicion. That's fine, but one of the things the Florence decision says is that when you're bringing in large numbers of people, sometimes you don't know. I mean, they're all people charged with all different kinds of things. And the Florence opinion says you can't classify people, prearrangement. It's a very difficult thing to do. And, you know, you worry when you sit on a bench that you're going to leave somebody vulnerable to a perfectly terrible injury which is going to have them hospitalized. So what's the other, your opponent does have an interest on their side of the equation. I would agree, and I agree it's important to keep contraband out of jails. And I certainly agree as a civil rights lawyer that it's important to protect detainees from harm. But there are lesser measures that can be used here to do that. We talk about weapons. I have to go through a magnetometer to come into this courthouse. They can use a magnetometer to detect weapons and phones and that type of thing at the West Virginia Regional Jails. That is a lot less intrusive. What do you think, after the search, what other fact in Teeter's case, what other fact makes the constitutional violation that, what is that? Well, I would think the central fact in what has not been raised today that makes Mr. Teeter's treatment and everyone's treatment. What is the central fact? Dilousing. Having a complete stranger spray your genitals with an Ace Hardware pressurized lawn and garden spray can. Wait, as to the search? Well, that's certainly part of the search. That is a seizure to make contact with someone's genitals. No, wait, stop for a second. I'm sorry, sir. Is your answer that if there hadn't been a dilousing, there would not have been a constitutional violation as to Mr. Teeter? No, sir. Well, then dilousing can't be it. I'm asking as to the search. That's what we've been talking about. We'll talk about dilousing in a second. What is the one fact that exists in Teeter's situation that makes this a constitutional violation in Florence? I didn't mean to interrupt, Your Honor. I'm sorry. An inability to exercise your constitutional right to be arraigned, to contest your detention. I don't know what that means. No, just say it in everyday terms. What? To see a judge. He didn't get to see a judge before he had to go through this. And there was no determination made that he was going to go from what the defendants or the police style as a temporary commitment to a court-ordered commitment. Let me ask you if it's the case, just a hypothetical, that this person has been arrested for dealing drugs. I'm not talking about your client. This person has been arrested for dealing drugs 300 times in that jurisdiction. He's served time after time after time. And the officers know. There's no question. There's just any realistic question that this person is going anywhere but other than to the general population. But they know that before the arraignment. You would say that's still a constitutional violation? No, sir, because I would stretch that person myself because there's reasonable suspicion to believe that they have a weapon or contraband based on their history. Wait, stop. They got arrested for passing bad checks. That's different. No, that's why I changed the hypothetical. It is different. No. So that means then that person, arrested 300 times before, gets 12, 15 months every time he does it. He just can't help himself. But he hasn't been arranged yet. The officers know he's going to the general population. They can't search him until the arraignment. I would say, Your Honor, that it would be certainly. You get me? I'm just looking for what is the dividing point that you say that plus the search is a constitutional violation. Lack of judicial process. Okay. And nobody can, just as we can't come before this court as lawyers and try to say what Your Honors are going to do. Yes, in that connection. Suppose, I mean, sometimes people are held in large holding cells with large numbers of people before they are brought for arraignment. And I'm wondering whether the critical thing is the general population. If someone's held in a holding cell with 15 other people and you haven't brought them for arraignment, in that circumstance, would you be able to strip search someone? No, Your Honor, for the same reasons I said before. And also because these individuals are searched. They have the ability to be put through a magnetometer. They have the ability to use something called a Bosch chair, which detects metal in body cavities. And, you know, it's not like they're in there unsupervised. What's your main complaint about de-lousing? The main complaint is that the inmates weren't allowed to do it to themselves? Yes. That using an Ace Hardware pressurized lawn garden spray can is dehumanizing and unnecessarily humiliating. Let me ask you this. That's not what I asked you. I said that they were not allowed to spray themselves. No, that they weren't allowed to apply the solution to themselves. Okay. So not to be sprayed. So they had to be given it in some form they could rub on themselves. It's a shampoo that comes in a bottle. This is detailed in the record. And you can put it into a cup. It's just like shampoo, and you can wash yourself with it. That's what I said. They can rub it on themselves. Yes. There's a big difference between. And so you think that they'd be a constitutional violation under de-lousing, even if the rule was we give you the Ace spray can and you have to spray yourself. That would still be a constitutional violation in your opinion. Yes, because it's a difference between having you take care of your private parts and your face and your hair. What if they allow you to do that with the Ace spray can? They just say, for various health reasons, we don't want to give you this liquid. We're just going to put it in a can, but you have to spray yourself. We're not going to do it, but you've got to spray yourself good. That's a constitutional violation in your mind? No. I would think, however, they could give it to them in a cup. That would be a lot easier. Yeah, but it would make it a constitutional violation if they could do it a little bit better than they did it. I'm sorry? It doesn't make it a constitutional violation, does it, if somebody could think of a little bit better approach to it? It does under Turner. If you can show that there are de minimis. Are we getting awfully close to being prison wardens when we're going to say exactly how the delousing procedure ought to go and exactly what this and what that? I mean, one of the points of Florence is that we're not to substitute our judgment for that of correctional officials. I mean, the farther we get into the weeds in dictating exactly how this procedure should go or how that procedure should go, the more we just start taking over a function for which we haven't been trained and for which, frankly, we're just not competent. The Turner decision makes clear that you have the right to select or you have the right to, if there's a de minimis way that an inmate's rights can be protected and correctional facility and the corrections interest can be accommodated to that, that de minimis interest should be used. And it also makes clear that oftentimes that can be a jury determination, which is one of the underlying problems with Judge Chambers's decision, is that certainly under the recent Supreme Court decision in Tolan v. Cotton, it's made clear that district courts should not become fact-finders in these kind of issues, that they should allow for fact-finding. But this is a reasonable de minimis alternative to spraying down someone's genitals. I mean, you know, if we can't do anything. I've given you both a lot of extra time. I appreciate that, Your Honor. I think we're ready to come down and shake hands and move on to our second case. Thank you, Your Honor.
judges: J. Harvie Wilkinson III, Dennis W. Shedd, James A. Wynn, Jr.